**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) CRIMINAL NO. 17-274 |
| | ) |
| v. | ) |
| **MICHAEL GINYARD**, | ) |
| | ) |
| Defendant. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, Senior District Judge.

I. Introduction

Defendant Michael Ginyard ("Ginyard") filed three motions to suppress evidence obtained with respect to: (1) a search of 6942 McPherson Boulevard, Pittsburgh, Pennsylvania, on January 15, 2017 (the "McPherson search") (ECF No. 41); (2) a search of 345 Hershey Road, Pittsburgh, Pennsylvania, on February 27, 2017 (the "Hershey search") (ECF No. 36); and (3) cell tower location information pursuant to a 18 U.S.C. § 2703(d) order dated October 16, 2017 (ECF No. 40). The gravamen of Ginyard's theory is that the initial warrantless "protective sweep" of the McPherson Boulevard home was without consent or probable cause and that all subsequent searches were tainted by that illegal entry. Ginyard also seeks a "*Franks* hearing" about the veracity of one statement in the February 27, 2017 application for the Hershey search warrant, namely, that phone contacts were made with Ginyard to buy $200 of "heroin." The government filed an omnibus response in opposition (ECF No. 43). On October 22, 2018, the court held an evidentiary hearing. The parties were permitted to file simultaneous proposed findings of fact and conclusions of law. The government filed its post-hearing submission on

December 8, 2018. Defendant filed his position on December 20, 2018.[1] The motions are ripe for disposition.

II. Factual and Procedural Background

Ginyard is charged in a six-count indictment at Criminal Number 17-274 with: possession with intent to distribute heroin and fentanyl on January 15 and February 27, 2017; possession of ammunition by a convicted felon on January 15, 2017; attempt to distribute heroin from February 13 to February 27, 2017; possession of a firearm in furtherance of drug trafficking on February 27, 2017; and possession of ammunition and a firearm by a convicted felon on February 27, 2017.

Findings of Fact

1. Pittsburgh Police Officer Robert Monticelli ("Monticelli") testified at the hearing. Monticelli offered credible testimony. The government submitted three exhibits, the McPherson search warrant and application (Govt. Ex. 1), the Hershey search warrant and application (Govt. Ex. 2) and the cell site location information order and application (Govt. Ex. 3).

2. The defense did not present any witnesses and submitted one exhibit, a compilation of text messages between City of Pittsburgh detective Sheila Ladner ("Ladner") and a cell phone number attributed to Ginyard (Def. Ex. A).

---

[1] Ginyard submitted a handwritten, pro se submission to the court which was filed on December 3, 2018 (ECF No. 46). The court will disregard that submission because it contains statements made while not under oath and with no opportunity for cross-examination after the defense decided to not present evidence or testimony at the hearing, and because the court does not consider submissions from a defendant while he is represented by counsel. District courts have the "authority to issue limitations on [defendant's] pro se filings submitted while represented by counsel." *United States v. D'Amario*, 256 F. App'x 569, 570 (3d Cir. 2007); *see McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) (a defendant does not have a constitutional right to "hybrid" representation); *United States v. Turner*, 677 F.3d 570, 579 (3d Cir. 2012) ("except in cases governed by *Anders*, parties represented by counsel may not file pro se briefs.") (citing *Anders v. California*, 386 U.S. 738 (1967)).

3. On January 15, 2017, Monticelli was acting as a field training officer for recruit officer Megan Blair ("Blair"). (T. 8).[2] Monticelli was dressed in full uniform. Monticelli and Blair were in a marked police vehicle. (T. 9).

4. At approximately 3:04 p.m. on January 15, 2017, they received a 911 call for a gun threat and shots fired and responded to 6942 McPherson Boulevard. (T. 9).

5. That location is a private, row-house type home in a residential neighborhood. (T. 9).

6. When they arrived, the officers noticed several spent shell cases on the ground in front of the residence and as they walked up toward the front door, they observed several apparent bullet strikes and bullet fragments on the steps (T. 10).

7. Based on the nature of the 911 call and these observations, Monticelli believed it necessary to try to make contact with any occupants of the home who may be possibly injured or dying. (T. 10).

8. Numerous uniformed officers approached the front door, knocked loudly and announced themselves as police in an effort to get a response. They could hear noise and voices inside, but nobody immediately came to the door. Almost fifteen minutes passed until someone came to the door. (T. 11, 17).

9. Eventually, Louannette Williams ("Williams"), a 72-year-old woman, answered the door. The officers explained why they were there and that they wanted to make sure there was nobody injured, dead or dying inside. (T. 12).

10. The officers asked if they could come in and search the residence. (T. 12). The officers expressed emphatically that they were concerned about the possibility of somebody being injured inside and they wanted to do a protective sweep of the residence. (T. 15). The

---

[2] The official hearing transcript is filed at ECF No. 45. Citations to the transcript use the format "T. _."

officers did not make any threats or "or else" statements. (T. 15).

11. Williams was very agreeable and stated that the officers could search whatever they wanted. She never objected in any way, shape or form. (T. 14, 15). Officers were permitted to check whatever they wanted. (T. 20). She did not appear to be upset, flustered or scared. (T. 20).

12. The court finds that Williams voluntarily consented to the protective sweep of the McPherson home.

13. Williams told officers she heard gunshots, but did not know where they came from. (T. 20). Williams told the officers that she was the only person in the home, but that response was not satisfactory to Monticelli because based on his experience with domestic violence situations with shots fired, the person who answers the door may be a hostage. (T. 12-13).

14. After Williams gave permission, the officers conducted a protective sweep of the house. (T. 14).

15. While on the third floor of the home, the officers observed in plain view a dinner plate on the floor with what appeared to be heroin all over it, a Slurpee straw and drug packaging material. (T. 21).

16. The officers secured the home and applied for and obtained a search warrant. (T. 14, 24).

17. In the ensuing search of the McPherson home, officers recovered heroin, paraphernalia, $2,000 in cash, various types of ammunition (some of which matched the spent casings recovered on the street), an iPhone and iPad, a photo ID for Ginyard and two pieces of business mail with Ginyard's name and the McPherson address, among other items.

18. Ginyard called while officers were on scene at the McPherson home on January 15, 2017, but refused to turn himself in. Officers obtained an arrest warrant. *Id*.

19. The facts relating to the Hershey search on February 27, 2017 are set forth in the affidavit for probable cause and application for a search warrant for the Hershey home, which incorporated a police investigation report of the McPherson incident and the arrest warrant. (Govt. Ex. 2).

20. From the information obtained in the McPherson search and a conversation with the alleged target of the shooting (Jaclyn Eidinger, Ginyard's intimate partner), officers identified at least two phone numbers used by Ginyard, including (412)583-0482. They planned to lure Ginyard to a meeting (to arrest him) by setting up a heroin purchase on the phone. Between February 13 and February 27, 2017, Ladner exchanged numerous texts to set up details of the meeting. (Def. Ex. A). On February 27, 2017, Ginyard agreed to meet Ladner at the Penn Hills Shop and Save. When she arrived, Ginyard used the phone to give her additional directions. Assisting detectives observed Ginyard following Ladner in a gray rental car. Officers attempted to set up a traffic stop, but Ginyard led them on a high speed chase and escaped. A minute later, though, agents saw the rental car parked in front of 345 Hershey Road, Pittsburgh, PA (the "Hershey residence"). Officers set up a perimeter around the property, which had two structures. About 75 minutes later, Andre Hamm arrived. He refused consent to search, but volunteered to look around himself. About ten minutes later, Ginyard came out, with the rental car keys on his person. He was given *Miranda* warnings and admitted being involved in the car chase. *Id*.

21. Officers applied for a search warrant for the Hershey residence.

22. Defendant contends that one paragraph of the affidavit contains a misrepresentation, specifically, the statement: "The nature of the phone contact was concerning Ladner meeting with Ginyard for the purpose of purchasing two hundred dollars worth of heroin." *Id*.

23. A Pennsylvania magisterial district judge issued the search warrant, which officers then executed.

24. On October 16, 2017, a United States magistrate judge granted the government's application and issued an order to disclose cellular tower data on phone number (412)583-0482 for the period from January to February 2017. (Govt. Ex. 3). The magistrate judge found that the government offered specific and articulable facts showing reasonable grounds to believe the information sought was relevant and material to an ongoing criminal investigation. *Id.*

## Conclusions of Law

1. The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV.

2. Ginyard argues that the McPherson search was not supported by consent or probable cause and that all subsequent searches are fruit of the poisonous tree. Ginyard contends that the Hershey search was not supported by probable cause that the items searched for would be found at that location. Ginyard also contends that he is entitled to a *Franks* hearing because the affidavit in support of the Hershey search contains a material misstatement. Ginyard does not specifically challenge the § 2703(d) application in his post-hearing submission. (ECF No. 49).

3. The government must prove, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

### A. The McPherson search

4. The government does not argue in its post-hearing submission that Ginyard lacks standing to

challenge the search of the McPherson home. The search warrant application stated that Ginyard was the sole occupant of the third floor of the McPherson home.

5. The officers' initial entry into the McPherson home on January 15, 2017, was without a warrant. Searches undertaken without judicial oversight and a warrant issued upon probable cause are "per se unreasonable," subject only to a few specifically established exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967).

6. One well-established exception is consent. "[T]he search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States v. Matlock*, 415 U.S. 164, 165–66 (1974). Consent may be obtained either from the individual whose property is searched or from a "third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citing *Matlock*, 415 U.S. at 171). "Common authority rests not on property rights but 'rather on mutual use of the property by persons generally having joint access or control ... so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.'" *United States v. Stabile*, 633 F.3d 219, 230-31 (3d Cir. 2011) (quoting *Matlock*, 415 U.S. at 170).

7. To determine whether a consent to search was made voluntarily, the court considers the "totality of the circumstances, including the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *United States v. Price*, 558 F.3d 270, 278 (3d Cir. 2009). "[T]he setting in which the consent was obtained and the parties' verbal and non-verbal actions" are also relevant considerations

7

in determining the voluntariness of the consent. *United States v. Kellam*, Crim. No. 14-323, 2015 WL 6560637, at *6 (M.D. Pa. Oct. 29, 2015) (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003)). The government bears the burden of proving that the consent was voluntary by a preponderance of the evidence. *United States v. Cabrera*, Crim. No. 05-422, 2007 WL 1575014, at *2 (M.D. Pa. May 31, 2007) (citing *United States v. Velasquez*, 885 F.2d 1076, 1081 (3d Cir. 1989)).

8. Williams' consent was voluntary. Officer Monticelli testified credibly that Williams was very agreeable and not upset, flustered or scared. Williams had authority to consent because she was the owner of the McPherson home and was the only person present in the home at the time consent was given.

9. The officers' protective sweep of the McPherson home did not exceed the scope of Williams' consent. Monticelli testified credibly that Williams stated that the officers could search whatever they wanted in the home.

10. Ginyard's proposed findings of fact acknowledge that "Williams indicated no objection to a request for search/protective sweep to locate any other persons inside the residence," and that she permitted officers to "[c]heck whatever you want." (ECF No. 49 at 3 ¶ 15).

11. The court concludes that Williams validly gave consent for officers to perform a protective sweep of her McPherson home on January 15, 2017.

12. Because the court finds that Williams consented to the search, the court need not address the government's alternative argument that even in the absence of consent, their entry was a lawful protective sweep pursuant to *Maryland v. Buie*, 494 U.S. 325, 333-36 (1990).

13. Under the "plain view" doctrine, when an officer is legally present where the evidence is in plain view and the incriminating character of the evidence is immediately apparent, there is

"a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136-37 (1990).

14. In this case, officers were legally present in the third floor bedroom of the McPherson home and observed, in plain view, a dinner plate on the floor with what appeared to be heroin all over it, a Slurpee straw and packaging material. It was lawful for the officers to include those observations in the search warrant application. *See United States v. Savage*, No. CRIM.A. 07-550, 2013 WL 271797, at *4 (E.D. Pa. Jan. 24, 2013) (where officer was legally present and observed items suggestive of narcotics trafficking in plain view, then went to a local magistrate to obtain a search warrant, that search warrant was valid). Ginyard does not challenge the ensuing search pursuant to the search warrant.

15. In summary, the search of the McPherson home was lawful.

### B. The Hershey search

16. The government argues that Ginyard lacks standing to challenge the Hershey search.

17. Defendants bear the threshold burden to establish standing to raise a Fourth Amendment challenge. *United States v. Meran*, No. CR 16-222, 2017 WL 4803927, at *9 (W.D. Pa. Oct. 23, 2017). In *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), the Supreme Court explained: "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." As this court concluded in *Meran*, a defendant need not affirmatively present evidence of his legitimate expectation of privacy; rather, he may simply "point to specific evidence in the record which the government [has] presented and which establishe[s] his standing." 2017 WL 4803927, at *10 (citations omitted). The burden may be met by evidence given by the government. *Id*.

18. The government's reliance on *United States v. Gatson*, 744 F. App'x 97 (3d Cir. Aug. 9,

9

2018), for the proposition that a defendant cannot simply rely on the government's attribution of a cell phone to him as evidence of standing, is misplaced. *Gatson* involved one cell phone owned by a person other than the defendant and one "burner" phone with no subscriber information. The defendant never claimed an interest in either phone. By contrast, the evidence submitted by the government to obtain the search warrant for the Hershey home showed Ginyard's connection to the property. The February 27, 2017 search warrant listed both Ginyard and Andre Hamm ("Hamm") as "owner, occupant or possessor" of the premises and the application included Hamm's statement to officers that Ginyard had been staying at the Hershey residence for a day or two. An overnight guest at a home generally has standing to challenge a search. *Minnesota v. Olson,* 495 U.S. 91, 96-97 (1990).

19. The government argued at the hearing that Ginyard averred in his motion to suppress that he had no connection to 345 Hershey. The court disagrees. At most, the motion contains a statement from Hamm that Hamm did not know Ginyard, which officers did not believe, and a statement that the existence of the Hershey residence was previously unknown (to officers). (ECF No. 36 ¶¶ 8, 11).

20. The court concludes that Ginyard has standing to challenge the Hershey search.

21. The search of the Hershey residence was done pursuant to a search warrant issued by a magisterial district judge. This court must conduct "a deferential review of the initial probable cause determination made by the magistrate." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010). The Third Circuit Court of Appeals summarized the applicable legal principles in *Stearn*:

> The role of a reviewing court is not to decide probable cause de novo, but to determine whether "the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238, 103 S. Ct. 2317 (citation and quotation omitted). As we explained in *Jones*,

> [O]ur role is not to make our own assessment as to whether probable cause existed. Rather, we are constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made.
>
> *Jones*, 994 F.2d at 1057. If a substantial basis exists to support the magistrate's probable cause finding, we must uphold that finding even if a "different magistrate judge might have found the affidavit insufficient to support a warrant." *Conley*, 4 F.3d at 1205. Although we do not merely "rubber stamp a magistrate's conclusions," *Whitner*, 219 F.3d at 296 (citation and quotation omitted), we must heed the Supreme Court's direction that "doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Gates*, 462 U.S. at 237 n. 10, 103 S. Ct. 2317 (citation and quotation omitted).
>
> Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Id*. at 232, 103 S.Ct. 2317. When presented with an application for a search warrant, the magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238, 103 S.Ct. 2317. Although every affidavit ideally would contain direct evidence linking the crime with the place to be searched, a magistrate may issue a search warrant even without direct evidence. Probable cause can be, and often is, inferred from "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence]." *Jones*, 994 F.2d at 1056 (citation and quotation omitted). Because probable cause is a "practical, nontechnical conception," we are concerned with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 231, 103 S.Ct. 2317 (citation and quotation omitted).

*Id*.

22. The application for the Hershey search warrant incorporated the January 15, 2017 investigation report, which recounted numerous facts about Ginyard's illegal narcotics activities as learned from the McPherson search and subsequent investigation, and the arrest warrant. The affidavit set forth the officers' extensive experience and training, the officers' plan and efforts to set up a meeting to buy heroin from Ginyard so he could be arrested, the meeting at the Shop and Save on February 27, 2017, the identification of Ginyard driving a rental car while talking on the phone to Ladner, the ensuing chase, finding the car shortly

thereafter parked at 345 Hershey, seeing the phone in the rental car with Ladner's number on it, and the subsequent encounters with Hamm and Ginyard. The affidavit reflected that: (1) the car was found outside the Hershey residence only a minute after the attempted drug deal with Ladner; (2) Ginyard came out of the Hershey home with the keys to the rental car; (3) he admitted to officers, after being Mirandized, that he was involved in the chase; and (4) Hamm stated that Ginyard was staying at the Hershey home. The facts supported a practical, common-sense inference that the heroin Ginyard was going to sell to Ladner would be present at 345 Hershey.

23. The information presented to the magistrate provided a "substantial basis for concluding that probable cause existed" that illegal drugs would be found at the Hershey residence.

24. In summary, the search of the Hershey residence was lawful.

### C. *Franks* Hearing

25. Ginyard seeks a "*Franks* hearing" regarding the affidavit for the Hershey search warrant.

26. To trigger the right to a *Franks* hearing, a defendant must make a "substantial preliminary showing" that: (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) the allegedly false statement is necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The Supreme Court explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id*. at 171.

27. Ginyard failed to meet either prong of this test.

28. As to the "falsity" prong, Ginyard concedes that "there was no false information per se." (ECF No. 49 at 5). Ginyard argues instead that the officers' failure to inform the magistrate that the text messages never used the word "heroin" constituted a reckless disregard for the truth. As explained in *United States v. Brown*, 631 F.3d 638 (3d Cir. 2011), "[a]n assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Id*. at 645 (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir.2000)). The court identified two distinct ways in which conduct can be found reckless: "either the affiant actually entertained serious doubts; or obvious reasons existed for him to do so, such that the finder of fact can infer a subjectively reckless state of mind." *Id*.

29. This court reviewed the text messages exchanged by Ladner and phone number (412) 583-0482, which was attributed to Ginyard. (Def. Ex. A). It is true that the word "heroin" was never used. The court concludes, nevertheless, that this was not an omission made with reckless disregard for the truth. The affidavit recounted the officers' extensive experience in narcotics enforcement and in purchasing illegal drugs from drug dealers. The police investigation report incorporated into the Hershey search warrant application detailed the evidence of Ginyard's heroin activity as obtained from the McPherson search and subsequent investigation. In the affidavit it was explained that the officers planned to set up a meeting with Ginyard to buy heroin so they could arrest him. The text messages are reasonably interpreted, based on the officers' training and experience, as setting up that drug deal.

13

Ladner states in a text that a friend "wants 80 so I'll have 200." (*Id*.). Ginyard asks how she got his number and what she's wearing. A later text states: "I got my income tax and want a whole one." (*Id*). Ginyard responds: "Let me know if you get a ride." (*Id*). After several aborted attempts to meet, Ginyard states on February 27, 2017: "getting them now right around the corner. You got 200 right?" (*Id*). It was not necessary for the affiants to repeat the entire exchange of text messages verbatim in the affidavit. The officers' summary statement in the affidavit that the nature of the text messages involved a meeting with Ginyard to purchase "heroin" was not made with reckless disregard for the truth.

30. As to the "necessity" prong, the court must consider whether the affidavit's remaining content is sufficient to establish probable cause, if the allegedly false material is set aside. *Franks*, 438 U.S. at 156. Ginyard did not challenge the veracity of any other facts in the affidavit or the documents incorporated therein. As explained above, there was strong support for the existence of probable cause to search the Hershey residence even if the officers had informed the magistrate that the text messages never used the term "heroin."

31. In summary, Ginyard is not entitled to a *Franks* hearing.

### D. The § 2703(d) order

32. Ginyard filed a motion to suppress evidence obtained pursuant to an order pursuant to 18 U.S.C. § 2703(d) to disclose cell tower location information. In his motion (ECF No. 40), Ginyard contended that his presence at any cell tower location was not relevant or material to any ongoing criminal investigation. Ginyard did not challenge the §2703(d) order during the hearing or in his post-hearing submission.

33. On October 16, 2017, when the § 2703(d) order in this case was entered, the government was required to show only "reasonable grounds" for believing that the requested cell tower

records were "relevant and material to an ongoing investigation." 18 U.S.C. § 2703(d). This test is less rigorous and "falls well short of the probable cause required for a warrant." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (prospectively requiring a search warrant to obtain cell tower information). Agents did not have to show some quantum of individualized suspicion, but "need only show that the cell-site evidence might be pertinent to an ongoing investigation—a "gigantic" departure from the probable cause rule." *Id*. The parties agree that the *Carpenter* probable cause standard does not apply to the order issued in this case.

34. To the extent that Ginyard is still pursuing this motion, the court agrees with the magistrate judge who issued the order that the government's application provided "reasonable grounds" for believing that the requested cell tower records were "relevant and material to an ongoing investigation." Of particular relevance, the application stated that agents observed Ginyard talking on the phone while directing Ladner where to drive to consummate their heroin transaction on February 27, 2017. The cell tower evidence may be relevant to confirm or rebut the officers' observations.

35. Because the McPherson search and the Hershey search were lawful, for the reasons set forth above, the cell tower information will not be suppressed as fruit of the poisonous tree.

36. In summary, Ginyard's motion to suppress the cell tower information will be denied.

### III. Conclusion

After careful consideration of the record and relevant legal authorities, the court concludes that the motions to suppress evidence filed by Ginyard (ECF Nos. 36, 40, 41) will be DENIED.

An appropriate order will be entered.

January 18, 2019

BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | ) | **CRIMINAL NO. 17-274** |
| | ) | |
| v. | ) | |
| **MICHAEL GINYARD,** | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 18th day of January, 2019, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that the motions to suppress evidence filed by defendant Michael Ginyard (ECF Nos. 36, 40, 41)) are **DENIED**.

A status conference is scheduled for January 22, 2019 at 3:30 p.m., to set a trial date as the Speedy Trial clock is now running.

BY THE COURT:

/s/ Joy Flowers Conti
Joy Flowers Conti
Senior United States District Judge